The cause was tried before HALL, J., in PITT, at September Term, 1811, when the jury found a verdict for the plaintiff for £ 250, subject to the opinion of the court on the question whether the plaintiff was entitled to judgment. Judgment was rendered in favor of the plaintiff by the judge who tried the cause; from which an appeal was taken to this Court, on the following case:
The defendants entered into a charter party with the plaintiff, by which they agreed to take the ship Cornelia on freight, for a voyage from Perquimons River to Cadiz, and thence to New York. At Perquimons River she was to take on board a certain quantity of (458) staves, with which she was to proceed to Wallace's Channel, where an additional quantity was to be put on board to complete her cargo, which was to be delivered to the defendant's consignees at Lisbon, who *Page 340 
were to pay the freight on the delivery of the cargo. The proceeds of the outward cargo were to be invested in wines at Lisbon, and brought to New York free of freight.
The ship received on board at Perquimons River the stipulated number of staves, and proceeded to Wallace's Channel, where she was stranded by the violence of a storm, and rendered unable to proceed on the voyage.
The cargo was abandoned by the defendants to the insurers, and it was sold by the commissioner of wrecks, under the authority of the captain. The defendants became the purchasers and sold it to the plaintiff. The ship was also abandoned to the insurers, sold, and purchased by the plaintiff.
It was not proved that the defendants required the captain either to refit his ship or to procure another to convey the cargo to the destined port; nor was it proved that the plaintiff made any offer to do so.
It may be considered as a settled principle that there are cases in which the shipper of goods is liable to the payment of a pro rata freight, notwithstanding the existence of a charter party, which provides that the freight shall be paid only on the delivery of the goods at the port of destination.
Some of these exceptions to the general rule are produced by an inevitable necessity; others are dictated by the clearest principles of justice and equity, or founded on the tacit agreement of the parties.
If, for the preservation of the ship and the residue of the cargo, a portion of it is thrown overboard, the merchant will be indemnified (459) by a general average, but he is liable to the payment of the freight of the goods thus sacrificed, upon the arrival of the vessel.
Necessity may compel the captain to sell a part of the cargo for victuals and repairs; in which case the owner of the vessel must pay the merchant the price which his goods would have brought at the destined port; but he may also charge him with the full freight in the same manner as if they had been safely delivered. Another corollary from the same principle is, where a neutral vessel is taken, carrying the property of a belligerent, the captain is liable to the payment of full freight, because his act prevented the completion of the voyage, and is equivalent to an actual delivery of the goods to the consignee.
The law will likewise imply an undertaking to pay a ratable freight, from the owner's receiving the goods at a port short of that of delivery, *Page 341 
where the ship is prevented by some disaster from prosecuting the voyage, and all expectation of ulterior profit, either to the owner or shipper, totally destroyed.
It has been long since established as a rule in the marine law, and is adopted by most of the commercial nations in the world, that the master may in such case hire another ship to convey the goods, and so entitle himself to his full freight. But if he is unable or declines to do this, and the goods are there received by the merchant, he becomes entitled to a freightpro rata.
The principle was first distinctly recognized in England in Lutwidge v.Grey, H. L., in 1733.
Lutwidge, the owner of a ship, let her, by her charter party, to Gray and others, residents of Glasgow, for a voyage from Glasgow to Maryland or Virginia, and back from thence to Glasgow, and was to receive freight from them for the homeward cargo only. The ship sailed to Virginia and there delivered her outward cargo, and took on board a cargo of tobacco, part of which belonged to other persons, and was taken to complete the lading. Gray Co. insured their part of the cargo with persons living at Bristol. The other part was insured. On the (460) return homeward, the ship was cast away at Youghal, in Ireland, which is within a short distance of Glasgow, and part of the cargo was saved and deposited in the custom office there. Lutwidge, as soon as he knew of the misfortune, informed Gray Co. of it, and told them he should provide another ship to transport the tobacco which was saved. Gray Co. abandoned their part of the cargo to their insurers, and endorsed over the bills of lading to them. Lutwidge provided another ship at Youghal, but the insurers took the part of the cargo abandoned to them, and conveyed it to Bristol. The agent of the proprietors of the other part of the cargo sent it to Glasgow in another vessel. Lutwidge brought an action against Gray and others for his freight according to the charter party, in the court of admiralty in Scotland, which, after a decision there and two decisions in the court of sessions, was finally adjudged in the House of Lords in England, who declared that Gray and others were liable for the full freight of such of the goods as were given up to the insurers, and for the freightpro rata itineris of such of the goods as were brought to Glasgow, notwithstanding some of the tobacco was found damaged and burnt there.
It is evident that the full freight was allowed in this case because the owner of the ship had provided another to transport the goods to Glasgow, of which Gray would not avail himself; preferring, rather, to abandon them to his underwriters. The pro rata freight only was allowed as to the others because they had reason to suspect that the master of *Page 342 
the hired vessel would not deliver the property at Glasgow, but at some other port; and therefore they were justifiable in providing a vessel for their own use.
In Luke v. Lyde, 2 Burr., 882, which occurred more than twenty years afterwards, the above doctrine was fully adopted; on which occasionLord Mansfield says: "If the master has his election to provide another ship to carry the goods to the port of delivery, and the merchant does not even desire him to do so, the merchant is still entitled to a (461) proportion of the former part of the voyage"; 97 Eng. Reprints, 616. This doctrine is recognized in several subsequent cases. 1 Bos. 
Pul., 634; and as the recovery is not sought for on the charter party, because it would then be necessary to prove a performance of the whole voyage, it can only be effected where the merchant receives the goods at an intermediate port, or does some act which is equivalent. Where the loss is total, no freight is due; but this total loss differs from a technical total loss as between insured and insurer. If part of the goods is saved, the loss is not total as between the owner of the ship and the merchant. The latter, it is true, may avoid the payment of freight by refusing to have anything to do with the cargo; but if he receive what is saved, he tacitly agrees to pay for transportation.
Does an abandonment to the insurer render the merchant equally liable to the payment of freight with an acceptance of the goods? It is believed by the Court that both acts stand upon the same principle, and cannot be distinguished from each other for the purposes of this case. The property remains in the merchant until some act is done calculated to divest him of it. The abandonment in this case was the last exercise of an act of ownership, for purposes highly useful and important to the owner, since it transferred all his right to the insurer, and entitled him to recover for a total loss; for it is a general rule that where the property is saved, but the voyage lost, the insured can only recover upon an average and not a total loss, unless he does abandon; otherwise, he might retain the property saved, and receive from insurer a full indemnity. But if the latter is to pay the whole insurance, he must have power to dispose of the property for his own benefit, that his loss may be rendered as light as possible. In the same manner, if the holder of a bill of exchange, in case of nonpayment, fail to give notice to the owner, he is considered as giving credit to the acceptor; and, therefore, the loss, if any, must fall on him.
The master might have retained the goods for the freight earned, and, therefore, have withheld his consent from the abandonment, and sold the goods for his own compensation. Not having done (462) so, he ought to be considered as having surrendered them to the *Page 343 
defendants, for the express purpose of enabling them to abandon and recover for a total loss; and they should be considered as having accepted them for the same purpose, upon an implied promise to pay the freight.